UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

VALENTINO SEXTO LOPEZ and
ROBERT GOLD                                                    05 Civil 3372 (WHP)
                                                              ECF CASE
                          Plaintiffs,
                                                              **THIRD AMENDED**
                                                              **COMPLAINT**

                  -against-                                    **Jury Trial Demanded**

CENTERPLATE, INC., VOLUME
SERVICES AMERICA HOLDINGS, INC.
THE NEW YORK YANKEES, MARY
JANE WELLS and JAIME HERSHKOWITZ,

                          Defendants.
----------------------------------------------------------X

          Plaintiffs Valentino Sexto Lopez ("Lopez") and Robert Gold ("Gold"), by and

through their attorneys, Arenson, Dittmar & Karban, as and for a Third Amended

Complaint against Defendants Centerplate, Inc. ("Centerplate"), Volume Services

America Holdings, Inc. ("VSA"), The New York Yankees ("Yankees"), Mary Jane Wells

("Wells") and Jaime Hershkowitz ("Hershkowitz") (collectively "Defendants")

respectfully allege, on behalf of themselves and all other similarly situated employees, on

personal knowledge with respect to themselves and their own acts, and on information

and belief as to all other matters, as follows:

### Preliminary Statement

1.       For many years, Defendants have engaged in a pattern and practice of

         discrimination against minority food service employees at Yankee Stadium.

         Defendants also have engaged in a pattern and practice of retaliation against

         those employees who have opposed Defendants' discriminatory practices.

Defendants also have created and fostered a hostile work environment in which (a) African-American and Hispanic employees have been called "niggers" and "spics"; (b) minority food service employees, like Lopez and Gold, systematically have been segregated to less lucrative and lower-paying positions; (c) less-qualified white and/or light-skinned persons are hired for the more lucrative and higher-paying positions; and (d) employees who oppose Defendants' discriminatory practices are subjected to retaliatory harassment, severe scrutiny, threats, intimidation and other acts of retaliation. Plaintiffs Lopez and Gold, therefore, on behalf of themselves and all other similarly situated employees bring this civil rights action in order to remedy the discrimination they have suffered, and continue to suffer, and to end systemic discrimination in the staffing of suites, lounges, restaurants and clubs at Yankee Stadium.

## **Parties**

2.   Plaintiff Lopez is an African-American and Hispanic male, a resident of the Bronx and a citizen of the United States.

3.   Plaintiff Gold is an African-American male, a resident of Brooklyn and a citizen of the United States.

4.   On information and belief, Defendant Centerplate is a South Carolina Corporation doing business in the State of New York.

5.   On information and belief, Defendant VSA is a South Carolina Corporation doing business in the State of New York, and is the predecessor to Centerplate.

6.     On information and belief, Defendant Yankees is a New York Corporation doing business in the State of New York.

7.     On information and belief, Defendant Hershkowitz is a resident of New York and a citizen of the United States.

8.     On information and belief, Defendant Wells is a resident of New York and a citizen of the United States.

**Factual Background**

A.     **Lopez Works At Yankee Stadium and Is Subjected to Discriminatory Treatment, As Part of Defendants' Pattern and Practice of Discriminatory Conduct.**

9.     The Yankees maintain and operate Yankee Stadium (the "Stadium") where the New York Yankees play their home games.  Pursuant to a written contract, Centerplate, through its Concession Division, operates the food services facilities at the Stadium.  The Yankees often dictate to Centerplate decisions on hiring, transfers, promotions, compensation, discipline and discharge in connection with the staff of the food service operations at the Stadium.

10.     In addition to the regular Stadium seating, Yankee Stadium contains five exclusive private rooms for viewing games ("Luxury Suites") and twenty-one private boxes ("Suites").  Suites are available for use only by their owners and their guests.  Each suite seats approximately sixteen people.  The Stadium also contains eleven private loges ("Loges") which are available for rental on a game-by-game basis.

11.     The Stadium also has several "Members-Only" restaurants and clubs, including "The Yankee Club", an upscale dining establishment, "Great Moments," a restaurant open on special occasions for former players, "The

Stadium Club/Lounge," a less exclusive restaurant and lounge, and "The Pinstripe Club," a sports bar.  Members of each of these clubs pay annual membership dues.

12.    In or around the 1984 season, Lopez began working for VSA, the predecessor to Centerplate, and the Yankees as a Busboy at the Stadium.  Centerplate compensates Busboys and Runners with an hourly wage of approximately $6.00 per hour.  Waiters however, are paid through a combination of an hourly rate and tips.  Lopez satisfactorily worked in this position until approximately 1987, at which time he voluntarily separated from his employment.  For the 1994 season, Lopez returned to his position as a Busboy at Yankee Stadium.

13.    Upon his return in 1994, Lopez was assigned to work as a Busboy and/or as a Runner, and occasionally as a Waiter, in the Stadium Club.  Lopez satisfactorily performed all of his duties.  At the time, he was again earning $6.00 per hour in compensation as a Busboy/Runner.  On those occasions in which Defendants permitted him to work as a Waiter, which were few in number, Lopez earned approximately $25.00 per day in tips, in addition to his hourly rate of $6.00 per hour.  Lopez continued working both as a Busboy and/or as a Runner, and occasionally as a Waiter during the 1995, 1996, 1997, 1998 and 1999 seasons.  Although during these years Lopez worked primarily in the Stadium Club, he also worked as a "Floater" on many occasions.  As a Floater, Lopez was required to work as a Busboy or as a Runner in many of the establishments in the Stadium, on an as-needed basis.

14.     In 1994, Lopez asked Defendants for an opportunity to advance in his career. He continued to ask for a better job in 1995, 1996, 1997 and 1998. Repeatedly, Defendants ignored Lopez's requests.

15.     During these years, Lopez noticed several disturbing facts about the food service operation at Yankee Stadium.  First, management of VSA (now Centerplate) at Yankee Stadium was and is entirely white.  Centerplate employs a General Manager ("GM") at Yankee Stadium to manage its food service operations.  At the time, the GM was Mary Jane Wells, a white female.  Upon information and belief, the GM is and always has been white. Centerplate also employs at Yankee Stadium mid-level managers called "Captains," who report directly to the GM.  Upon information and belief, Centerplate's and VSA's Captains at Yankee Stadium are and have been white.  Finally, Centerplate employs several persons at Yankee Stadium in the position of "Maitre D'."  The Maitre D', who directs customers to tables and seats them, reports to the Captain or, where there is no Captain, to the GM. Upon information and belief, the vast majority of those hired for the Maitre D' position at Yankee Stadium are currently, and always have been, white.

16.     Second, even below the supervisory level, Centerplate and the Yankees do not hire minorities for their more lucrative positions.  Centerplate employs "Runners," who set up and maintain buffets in the restaurants, "Busboys," who clear tables, "Waiters," who take and deliver orders to customers, both in the restaurants and in the Suites and Loges, and "Bartenders," who mix and serve drinks in the bars and restaurants.  Depending on the protocol within the

particular restaurant or bar, Runners, Busboys, Waiters and Bartenders report either to the Maitre D', the Captain or directly to the GM. Waiters and Bartenders earn far more money than Runners and Busboys. The vast majority of Runners and Busboys at the Stadium are African-American and Hispanic. In contrast, the vast majority of Bartenders are white.

17.  With respect to Waiters, Centerplate and the Yankees have a discriminatory two-tiered arrangement. On the one hand, there have been virtually no African-Americans or Hispanics working in the Luxury Suites, the Suites, or the Loges. As for the upscale Yankee Club, where Yankees owner George Steinbrenner regularly dines, the vast majority of Waiters working there are white. On the other hand, Centerplate and the Yankees have hired a number of African-American and Hispanics as Waiters in the less exclusive Stadium Club.

18.  For the job category of Waiters, the segregation and placement of minorities into the Stadium's "less exclusive" establishments has a direct effect on these employees' compensation. This is the case because tips in the Luxury Suites, the Suites, the Loges and the Yankee Club are significantly larger than the tips given in the Stadium Club and Pinstripe Club. Upon information and belief, a waiter in the Suites can make as much as $500 a night in tips. In contrast, a waiter in the Stadium Club and Pinstripe Club makes, on average, approximately $60.00 a night in total compensation.

19.  Finally, numerous white employees who started as Runners and Busboys were systematically and quickly promoted to positions as Waiters and Bartenders in

the Suites and Yankee Club.   Year after year, the same opportunities were denied to Lopez and other minorities.

**B.** **Frustrated By Centerplate's/VSA's and the Yankees' Discriminatory Practices, Lopez Applies for an Office Position With The Yankees and Is Passed Over for A Less-Qualified White Candidate.**

20.     Frustrated by Centerplate's/VSA's and the Yankees' on-going pattern of discriminatory practices, Lopez, who at the time was approximately 37 years old, decided to apply for a position with the Yankees outside of the food service area.   In or around early 1999, Lopez heard that the Yankees had an office position available in the accounting department.   Lopez, who had previously worked on Wall Street in the accounting field, then informed Joyce Papa, who worked in the Yankees' Human Resources Department, of his interest in the office position.   Lopez submitted a resume but never heard back from Papa.   When he inquired about the status of his application, Lopez was incorrectly informed that "nothing [was] available."

21.     Following Lopez's unsuccessful application for the clerical position, the Yankees interviewed and hired a less-qualified white candidate for the position.   Specifically, the Yankees hired Joe Garramone, a twenty-one year old white male, who had been hired by VSA as a Busboy in 1997.   Significantly, Lopez had initially trained Garramone.   Moreover, at the time Garramone was promoted over Lopez, Garramone had not yet obtained a college degree.   Although he was far less experienced than Lopez, Garramone earned at least twice as much as Lopez.

22.     Despite the fact that Lopez had previously earned an associates degree in office technology, had prior work experience in the accounting field, had worked for years with Centerplate/VSA, and was qualified for the clerical position, the Yankees passed him over without an interview and, instead, hired a less-qualified white applicant.

23.     The discriminatory nature of Defendants' summary dismissal of Lopez's application for the clerical position further confirmed Lopez's perception of a segregated and racially hostile work environment at Yankee Stadium.

**C.     Defendants Intensify the Hostile Work Environment in Which Lopez and Other Minority Employees Had to Work.**

24.     In June 1999, after approximately nine years of working for Centerplate, or its predecessor, VSA, Lopez was still working as a Busboy and/or as a Runner, and occasionally as a Waiter, in the Stadium Club.  At that time, Lopez was asked by Mike Masiano, the then Maitre D' of the Stadium Club, to train Matt Albright, a twenty-one year old white male, in the tasks of a Waiter.  Albright had been hired in 1997 and had been employed for two years as a Runner working the buffet in the Stadium Club.  Sometime in 1999, Albright began working as a Busboy with Lopez.  Then, in June 1999, one day after Lopez completed his training of Albright, Masiano promoted Albright to the position of Waiter and denied Lopez the opportunity to work as a Waiter.  Despite having less work experience, Albright was then earning approximately four times as much as Lopez.

25.     On or about July 5, 1999, Masiano requested that Lopez "float" and work as a Busboy and/or as a Runner in the Pinstripe Club.  At that time, Lopez

complained to Masiano that he had been treated unfairly when he was denied work as a Waiter and assigned to work as a Busboy and/or as a Runner, while a less-experienced white employee whom he had trained, Matt Albright, was promoted to the position of Waiter.  He also complained about being sent as a Floater to the Pinstripe Club and refused to go there.  Masiano then retaliated against Lopez by sending him home.  Lopez lost a day's pay.

26.     When Lopez returned to work, Masiano confronted him in the Stadium Club. In the presence of 15 to 20 people, Masiano said to Lopez, "You know, you should be happy that I've treated you like a white person."

27.     Upon information and belief, beginning in approximately 1994, on numerous occasions Masiano referred to minority employees as "niggers" and "spics." Although he often used these racist epithets in front of members of VSA's management, Masiano was nevertheless liked and respected by VSA's managers.

28.     After Masiano made the "white person" comment, Lopez complained to Mary Jane Wells, who was then the General Manager of VSA.  Lopez explained that he was offended by Masiano's comment because it suggested that as a Black and Hispanic person, he should ordinarily not expect to be treated the same as someone who was white.  The General Manager stated that she would take care of the situation.  She did not.

29.     Indeed, even after Lopez complained to VSA's General Manager Mary Jane Wells about Masiano's discriminatory comments, Masiano continued

regularly to refer to African-American and Hispanics as "niggers" and "spics" in Lopez's presence.

30.     On July 23, 1999, Lopez filed a verified complaint of discrimination with the New York State Division of Human Rights.

**D.      Following Lopez's Complaints, Centerplate/VSA and the Yankees Engage in a Heightened Campaign of Retaliation and Continuing Discrimination and Harassment.**

31.     After the commencement of the New York State Division of Human Rights investigation, Lopez continued working as a Busboy and/or as a Runner in the Stadium Club.  In order to improve his situation, Lopez approached General Manager Mary Jane Wells at the start of the 2000 season and requested that he be reassigned to a position as a Waiter in the Suites.  She replied that "we'll see what happens."

32.     Rather than seek to accommodate Lopez's request for a promotion to a position as a Waiter, Mary Jane Wells instead informed Louis Aponte, the Captain in the Stadium Club, that Lopez had "started a lawsuit against the company."  She then added the following ominous statement: "So you need to let me know if Valentino does anything wrong in the job, so we can write him up."  The message was clear: Lopez would be scrutinized more harshly than the other workers who had not complained and, indeed, set up for retaliatory termination.   Masiano and Mary Jane Wells also specifically instructed Aponte "not to use" Lopez as a Waiter.

33.     Pursuant to instructions from the highest levels of VSA, Lopez was not, or only rarely, used as a Waiter during the 2000 season.  On several occasions

during the 2000 season, when there was an open spot for a Waiter, Aponte was again specifically instructed not to use Lopez.  VSA thus retaliatorily and discriminatorily passed over Lopez for promotion to Waiter in favor of less-qualified candidates several times after he filed his complaint of discrimination.

34.   In the early part of the 2000 season, notwithstanding the fact that there was a pending investigation by the New York State Division of Human Rights, Masiano continued to make offensive racial remarks about minorities, using the words "spics" and "niggers" around other managers and employees of VSA.  Masiano would hail Busboys and Runners by saying "hey, you, the colored boy!"  Often, he would comment on "all of the spics" and "fuckin niggers" working in the Stadium Club.  He often called Busboys and Runners "stupid spic" and would yell at the minority employees in an abusive way, such as, "get the fuckin table cleaned, spic."

35.   On May 26, 2000, when the Investigator from the New York State Division of Human Rights informed VSA of the persistence of these racist comments through May 2000, VSA reluctantly terminated Masiano's employment.

36.   Despite Masiano's discharge, Lopez's situation did not improve.  If anything, his situation further deteriorated, as members of VSA's management were increasingly resentful of him due to the fact that they had been forced to terminate an employee who was well-liked by management.

37.   Subsequent to Masiano's discharge, Lopez became aware that various managers from both the Yankees and VSA were subjecting him to heightened

scrutiny in his job performance.  Specifically, on many occasions during the remainder of the 2000 season, Joyce Papa and Jaime Hershkowitz, either separately or together, would come into the buffet section of the Stadium Club where Lopez would be working, and would walk around the room, observing Lopez for approximately ten to fifteen minutes at a time.  Neither Papa nor Hershkowitz had ever previously come to the area of the Stadium Club while Lopez was working.  This close scrutiny by the Yankees and by VSA made Lopez extremely uncomfortable in performing his work.

38.   Moreover, in furtherance of the hostile work environment that Defendants created and maintained, VSA also continued to pass over Lopez for promotion to Waiter through the latter part of the 2000 season.  In or around September 2000, for example, VSA promoted Dino Calucci, a white male who began working with Lopez as a Busboy in 1997, to the position of Waiter.  Although Calucci had less experience and seniority than Lopez, he earned approximately four times as much as Lopez.

39.   During this time, VSA's and the Yankees' pattern and practice of discriminatory employment practices also persisted.  As in the past, the lucrative positions were given to white candidates, and segregation along racial and ethnic lines continued in the staffing of the Yankees' facilities.  No minorities were hired for Bartender positions.  Moreover, upon information and belief, in or around November 2000, George Steinbrenner himself, the General Manager and owner of the Yankees, specifically informed VSA that

he "didn't want his high-profile guests seeing non-white girls selling souvenirs."

40.    This racially discriminatory attitude also permeated the Stadium's "exclusive" food service establishments, such as the Suites.  Whenever Waitresses would leave the Suites, the Yankees management would discuss possible replacements with VSA and exercise their "veto power" over minority Waiters and Waitresses, like Lopez, who were qualified to serve in the Luxury Suites, Suites, Loges and the Yankee Club.

**E.    The Hostile Work Environment Continues Into and Throughout the 2001 Season.**

41.    In accordance with this familiar pattern of continuing discrimination and retaliation, and in furtherance of the continuing hostile work environment created and maintained by Defendants, VSA and the Yankees again placed Lopez in a Runner position at the start of the 2001 season in April 2001.

42.    As he did at the start of every new season since 1994, Lopez went to the VSA manager in the Stadium Club to ask to be promoted to a better-paying (*i.e.*, a Waiter) position.  That spring, the new manager of the Stadium Club was an individual whose first name is George.  Lopez personally told George that he (Lopez) had the most seniority of the VSA employees in the Stadium Club, and that therefore he was the next in line to be promoted to Waiter.

43.    Lopez had at least two conversations directly with George in which Lopez requested a promotion to the better-paying position of Waiter.  One of those conversations occurred early in the 2001 season, which would have been approximately in or about April through May of 2001.  The other of those

conversations occurred in the middle of the 2001 season, which would have been approximately in or about the Summer of 2001.

44.  On both occasions during the 2001 season, George advised Lopez to "wait and see" what would happen in the course of the season.

45.  Lopez repeatedly requested that he be promoted to a better-paying position during the course of the 2001 season.

46.  Although the Yankees opened up two new Suites during the 2001 season, Lopez was not considered for the new Waiter positions in those Suites, despite his over ten years of employment at the time (1983-87; 1994-2001).  Instead, VSA and the Yankees hired two white female Waitresses from outside VSA to work in the new Suites.

47.  Similarly, when a new Waiter position opened in the Loges during the 2001 season, VSA and the Yankees filled the position with a white female.

48.  Upon information and belief, George had been told not to promote Lopez as part of the continuing hostile work environment, the continuing pattern of racial discrimination, and the continuing pattern of retaliation against Lopez.

49.  Throughout the 2001 season, the Yankees and VSA continued to subject Lopez to severe scrutiny in his job performance.  Specifically, on many occasions during the 2001 season, Papa and Hershkowitz, either separately or together, would come into the buffet section of the Stadium Club where Lopez would be working (as they had during the 2000 season), and would walk around the room, scrutinizing Lopez for approximately ten to fifteen minutes at a time.

50.     During the 2001 season, George also began to scrutinize Lopez as he was working in the Stadium Club.  On some occasions, George would come by himself to the area where Lopez was working; on other occasions, George was accompanied by either Papa or Hershkowitz.

51.     Upon information and belief, none of the other workers was subjected to this kind of intense scrutiny by managers from the Yankees and from VSA. Rather, Lopez was being subjected to this severe scrutiny as part of a continuing hostile work environment and pattern of retaliation by the Yankees and by VSA against Lopez as a result of his 1999 complaint of discrimination to the New York State Division of Human Rights and his other internal complaints.

52.     This severe and on-going scrutiny of his job performance by the Yankees and by VSA also made Lopez extremely uncomfortable in performing his work, and thus constituted a continued pattern of harassment by the Yankees and by VSA, and further added to the continuing hostile work environment that Defendants created and maintained.

53.     In November 2001, Lopez filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that VSA and the Yankees discriminated against Lopez on the basis of his race, national origin and skin color and retaliated against him, and that these actions were continuing in nature.

**F.      Following Lopez's EEOC Complaint, Centerplate/VSA and the Yankees Continue to Subject Lopez to a Hostile Work Environment and to a Campaign of Retaliation and Discrimination.**

54.     At the beginning of the 2002 season, Lopez went to the VSA manager in the Stadium Club to ask to be promoted to a better-paying (*i.e.*, a Waiter) position.

55.     Throughout most of the 2002 season, Defendants continued to deny Lopez the position of Waiter, despite his seniority and qualifications, while continuing to promote less qualified white candidates

56.     In approximately September 2002, Defendants placed Lopez in the position of Bartender in the Suites.

57.     Throughout the 2002 season, Defendants continued to subject Lopez to severe scrutiny and harassment by constantly monitoring his job performance, first as a Busboy/Runner and subsequently as a Bartender.   Defendants did not subject other workers to similar scrutiny and harassment in their job performance.

58.     At the very time that Defendants discussed with Lopez moving him from the position of Busboy/Runner to the position of Bartender, Defendants attempted to inhibit Lopez from exercising his legal rights and from engaging in protected activity.

59.     Specifically, Joyce Papa, who worked in the Yankees' Human Resources Department, told Lopez that he should "do something about a lawsuit" now that Defendants were willing to place him in a different position.

60.     Lopez felt threatened and intimidated by this retaliatory statement.

61.    This statement contributed to and fostered the on-going hostile work environment created and maintained by Defendants.

62.    Notwithstanding the reassignment of Lopez to the position of Bartender in the Suites in approximately September 2002, the hostile work environment continued by, among other things, Defendants' denying Lopez the opportunity to work on the more lucrative parties.

63.    White Bartenders with far less experience and seniority than Lopez continued to be routinely assigned to larger parties and groups in which they made twice as much money as Lopez.  In many instances, the white Bartenders making twice as much money as Lopez have ten years' less experience working at Centerplate/VSA at Yankee Stadium than Lopez.

64.    During the 2003 season, the hostile work environment continued by, among other things, Defendants' denying Lopez the opportunity to work on the more lucrative parties.

65.    On at least two occasions during the Summer of the 2003 season, Lopez complained to John Wolf, the shop steward at Centerplate/VSA, that he (Lopez) was not being assigned to the more lucrative parties.  Upon information and belief, those parties were being assigned to white Bartenders.

66.    Throughout the 2003 season, Defendants also continued to subject Lopez to severe scrutiny and harassment by constantly monitoring his job performance as Bartender.  Defendants did not subject other workers to similar scrutiny in their job performance.

67. Such heightened scrutiny contributed to and fostered the hostile work environment created and maintained by Defendants.

68. During the 2004 season, the hostile work environment continued by, among other things, Defendants' denying Lopez the opportunity to work on the more lucrative parties.

69. Throughout the 2004 season, Defendants also continued to subject Lopez to severe scrutiny and harassment by constantly monitoring his job performance as Bartender.  Defendants did not subject other workers to similar scrutiny in their job performance.

70. Such heightened scrutiny contributed to and fostered the hostile work environment created and maintained by Defendants.

71. During the 2005 season, the hostile work environment continued by, among other things, Defendants' denying Lopez the opportunity to work on the more lucrative parties.

72. Throughout the 2005 season, Defendants also continued to subject Lopez to severe scrutiny and harassment by constantly monitoring his job performance as Bartender.  Defendants did not subject other workers to similar scrutiny in their job performance.

73. Such heightened scrutiny contributed to and fostered the hostile work environment created and maintained by Defendants.

74. Thus, Defendants have engaged in a long-standing and continuing policy and practice of discrimination against Lopez on the basis of race (African-American and Hispanic) and skin color (Black).

75.     Defendants also have fostered and have continued to foster a hostile work environment on the basis of race (African-American and Hispanic) and skin color (Black), as well as through retaliatory and intimidating conduct.

76.     Defendants also have retaliated and have continued to retaliate against Lopez by, among other things, attempting to dissuade him from engaging in protected activity and subjecting him to heightened scrutiny.  Indeed, Lopez was advised by certain fellow employees to "watch your back" because management wanted him out because he exercised his legal rights and filed a complaint of discrimination.

**G.     Gold Is Subjected to Defendants' Pattern and Practice of Discrimination.**

77.     In or around June 2000, Gold began working at Yankee stadium as a Busboy in the Pinstripe Club.  He was paid approximately $6.00 per hour.

78.     Shortly thereafter, Gold, who is African-American and dark-skinned, was reassigned to work as a Busboy in the bottom tier of the Stadium Club, where he also made approximately $6.00 per hour.

79.     Upon information and belief, the Waiters in the Stadium Club were mostly older individuals who had been employed in those positions for some time. As there was relatively little turnover among the Waiters in the Stadium Club, there was little opportunity for the Busboys/Runners in the Stadium Club to advance to a position as a Waiter in the Stadium Club.  In contrast, most of the Waiters in the Pinstripe Club were younger individuals who did not stay in these positions for lengthy periods of time.   The resulting high turnover

among the Waiters in the Pinstripe Club afforded greater opportunities for advancement to the Busboys and Runners who worked in the Pinstripe Club.

80.   On numerous occasions during the 2000 season, Gold advised Defendants of his desire to work as a Waiter.  Indeed, Centerplate/VSA used Gold to fill in for Waiters who were out sick and it was clear that he could perform the job of Waiter competently.

81.   Nevertheless, throughout the 2000 season, Defendants denied Gold a promotion to a position as a Waiter, while at the same time promoting less senior and less skilled whites and light-skinned individuals to the more lucrative position of Waiter.

82.   On numerous occasions throughout the 2000 season, Gold advised Defendants of his desire to be reassigned to the Pinstripe Club, where the opportunity for advancement was greater due to the higher turnover there.

83.   Despite Gold's repeated requests, throughout the 2000 season Defendants refused to reassign him to the Pinstripe Club, where he had worked initially, thereby denying him opportunities for advancement.

84.   On numerous occasions during the 2001 season, Gold continued to advise Defendants of his desire to work as a Waiter.  Nevertheless, despite Gold's successful performance as a substitute Waiter for Waiters who called in sick, Defendants continued to deny Gold a promotion to a position as a Waiter throughout the 2001 season, while at the same time promoting less senior and less skilled whites and light-skinned individuals to the more lucrative position of Waiter.

85.     On numerous occasions throughout the 2001 season, Gold advised Defendants of his desire to be reassigned to the Pinstripe Club with its greater opportunity for advancement.   Despite Gold's repeated requests, throughout the 2001 season Defendants refused to reassign him to the Pinstripe Club, thereby denying him opportunities for advancement.

86.     On numerous occasions during the 2002 season, Gold continued to advise Defendants of his desire to work as a Waiter.  Nevertheless, despite Gold's successful performance as a substitute Waiter for Waiters who called in sick, Defendants continued to deny Gold a promotion to a position as a Waiter throughout the 2002 season, while at the same time promoting less senior and less skilled whites and light-skinned individuals to the more lucrative position of Waiter.

87.     On numerous occasions throughout the 2002 season, Gold advised Defendants of his desire to be reassigned to the Pinstripe Club with its greater opportunity for advancement.   Despite Gold's repeated requests, throughout the 2002 season Defendants refused to reassign him to the Pinstripe Club, thereby denying him opportunities for advancement.

88.     On numerous occasions during the 2003 season, Gold continued to advise Defendants of his desire to work as a Waiter.  Nevertheless, despite Gold's successful performance as a substitute Waiter for Waiters who called in sick, Defendants continued to deny Gold a promotion to a position as a Waiter throughout the 2003 season, while at the same time promoting less senior and

less skilled whites and light-skinned individuals to the more lucrative position of Waiter.

89.     On numerous occasions throughout the 2003 season, Gold advised Defendants of his desire to be reassigned to the Pinstripe Club with its greater opportunity for advancement.  Despite Gold's repeated requests, throughout the 2003 season Defendants refused to reassign him to the Pinstripe Club, thereby denying him opportunities for advancement.

90.     On numerous occasions during the 2004 season, Gold continued to advise Defendants of his desire to work as a Waiter.  Nevertheless, despite Gold's successful performance as a substitute Waiter for Waiters who called in sick, Defendants continued to deny Gold a promotion to a position as a Waiter throughout the 2004 season, while at the same time promoting less senior and less skilled whites and light-skinned individuals to the more lucrative position of Waiter.

91.     On numerous occasions throughout the 2004 season, Gold advised Defendants of his desire to be reassigned to the Pinstripe Club with its greater opportunity for advancement.  Despite Gold's repeated requests, throughout the 2004 season Defendants refused to reassign him to the Pinstripe Club, thereby denying him opportunities for advancement.

92.     Thus, from approximately 2000 to 2004, Gold remained a Busboy, working primarily in the bottom tier of the Stadium Club, and only occasionally working as a substitute Waiter.  Throughout this period, Gold made approximately $6.00 per hour.

93.     In 2004, Gold applied for a position as a Bartender in the Loges and Suites, where he could make approximately $400 a night more in pay and tips.  Gold had been informed that there where openings for the Bartender position in the Loges and Suites and was the first employee to put his or her name down on the list of persons interested in such a position.

94.     Despite his experience, skill, hard work and acknowledged good job performance, Defendants did not promote Gold to the position of Bartender in the Loges or Suites.  Defendants promoted less experienced and less skilled persons who were either white or lighter-skinned than Gold.   Indeed, Defendants did not even interview Gold for the position of Bartender in the Loges or Suites.

95.     Instead, Defendants assigned Gold to work in the kitchen of the Pinstripe Club, where Gold would neither be seen nor interact with the higher paying and corporate customers that typically are in the Loges and Suites.

96.     In 2005, another position as a Bartender in the Loges or Suites became available.  Again, Gold was the first person to sign up on the list of persons interested in the position.  Again, Defendants did not even interview Gold for this position.

97.     Defendants filled this position with a less experienced, less skilled white employee, keeping Gold in the kitchen where he could not be seen.

98.     Throughout the period from June 2000 to the present, Gold also was exposed to the hostile work environment to which Defendants subjected Lopez. Indeed, Gold observed how, during the 2003 season, Defendants regularly

denied Lopez the opportunity to work as a Bartender for the more lucrative parties in the Loges.

**H**.   **The EEOC Determines That Reasonable Cause Exists To Believe That Lopez and a Class of Similarly Situated Employees Were Subjected to a Pattern And Practice of Discrimination and to Retaliation.**

99.   On April 26, 2005, the EEOC issued its Determination in connection with the Charge of Discrimination that Lopez had filed in November 2001.  After conducting an investigation that lasted more than three years and included, among other things, detailed submissions from all parties and a visual inspection of the relevant restaurants, clubs and other facilities at Yankee Stadium, the EEOC determined that reasonable cause existed to believe that Lopez and a class of similarly situated employees were subjected to a pattern and practice of discrimination in violation of Title VII, and that Lopez was subjected to retaliation in violation of Title VII.  A copy of the EEOC's Determination, dated April 26, 2005 is attached hereto as Exhibit A.

**I**.   **Centerplate Retaliates Against Gold.**

100.   On September 27, 2005, the Second Amended Complaint was filed in this action, in which Robert Gold was added as a plaintiff.

101.   On or about October 10, 2005, shortly after Gold filed suit alleging, among other things, discrimination on the basis of race and skin color, Centerplate suspended Gold.

102.   After six seasons of good job performance, during which Centerplate had never suspended or even reprimanded Gold, Centerplate retaliated against

Gold for charging it with discriminatory practices, by suspending him within two weeks of his filing suit.

## Causes of Action

### First Cause of Action:

### Discrimination and Hostile Work Environment On The Basis of Race and Skin Color In Violation of Title VII of the Civil Rights Act of 1964, As Amended, 42 U.S.C. 2000e et seq.

103.   Plaintiffs allege, re-allege and incorporate by reference paragraphs 1 through 102 as if fully set herein.

104.   As set forth more fully above, Defendants subjected Lopez, Gold and other similarly situated minority employees, to a hostile work environment based on Plaintiffs' race (African-American/Hispanic and African-American) and skin color (Black).  The hostile work environment included, without limitation, overtly racist comments, the systematic segregation of minority employees into lower-paying positions, the continuing failure to promote Lopez, Gold and other similarly situated minority employees and severe scrutiny. Defendants also subjected Lopez to a hostile work environment, including but not limited to, retaliatory harassment and retaliatory acts, in response to his opposition to their discriminatory practices and his engaging in protected activity.

105.   Defendants also discriminated against Lopez, Gold and other similarly situated minority employees, on the basis of their race and skin color in, among other things, hiring, promotions, assignments and pay.

106. The racial and skin-color discrimination and the hostile work environment suffered by Plaintiffs, and other similarly situated employees, was part of a pattern and practice of racial and skin-color discrimination and harassment created and fostered by Defendants.

107. Defendants Mary Jane Wells and Jaime Hershkowitz aided, abetted, incited, compelled and/or coerced unlawful practices, including the racial and skin-color discrimination and the hostile work environment against Lopez, Gold, and other similarly situated minority employees, and/or attempted to do so.

108. Defendants participated in, approved of, condoned and ratified the discrimination, harassment and the hostile work environment perpetrated against Plaintiffs, as well as other similarly situated minority employees, on the basis of their race and skin color.

109. The racial and skin-color discrimination and the hostile work environment that Defendants perpetrated against Plaintiffs, as well as other similarly situated minority employees, was, and is, continuing and intentional in nature.

110. As a result, Lopez and Gold have suffered loss of earnings, plus interest.

111. Lopez and Gold are also entitled to compensatory damages for, inter alia, physical personal injury, physical pain and suffering, emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses in the maximum amount permitted by the law.

112. Because Defendants acted with malice or reckless indifference to Plaintiffs, and other similarly situated minority employees' rights, Plaintiffs are entitled

to punitive damages in an amount to be determined at trial, but not less than the maximum amount permitted by law.

### Second Cause of Action:
### Retaliation in Violation of Title VII of the Civil Rights Act of 1964, As Amended, 42 U.S.C. Section 2000e

113. Plaintiffs allege, re-allege and incorporate by reference paragraphs 1 through 112 as if fully set forth herein.

114. As set forth more fully above, Defendants retaliated against Lopez and Gold for their protected complaints of discrimination and harassment, by among other things, harassing them, subjecting them to a hostile work environment, subjecting them to severe scrutiny, denying them promotions, denying them opportunities for advancement, and denying them requested assignments to better paying jobs and positions.

115. The retaliation suffered by Lopez and Gold was a part of a pattern and practice of retaliation created and fostered by Defendants in response to complaints of discrimination and harassment made by Lopez, Gold and other employees.

116. Defendants Mary Jane Wells and Jaime Hershkowitz aided, abetted, incited, compelled and/or coerced unlawful practices, including unlawful retaliation, against Lopez, Gold and other workers who complained of discrimination and other unlawful practices.

117. Defendants participated in, approved of, condoned and ratified the retaliation perpetrated against Plaintiffs, as well as other similarly-situated employees.

118.   The retaliation that Defendants perpetrated against Plaintiffs, as well as other similarly situated employees, was, and is, continuing and intentional in nature.

119.   As a result, Lopez and Gold have suffered loss of earnings, plus interest.

120.   Lopez and Gold are also entitled to compensatory damages for, inter alia, physical personal injury, physical pain and suffering, emotional distress, suffering, mental anguish, and other non-pecuniary losses, in the maximum amount permitted by law.

121.   Because Defendants acted with malice or reckless indifference to Plaintiffs, and other similarly situated minority employees' rights, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, but not less than the maximum amount permitted by law.

### Third Cause of Action:
### Racial and Skin Color Discrimination and Harassment in Violation of 42 U.S.C. Section 1981

122.   Plaintiffs allege, re-allege and incorporate by reference paragraphs 1 through 121 as if fully set herein.

123.   As set forth more fully above, Defendants subjected Lopez, Gold and other similarly situated minority employees, to a hostile work environment based on Plaintiffs' race (African-American/Hispanic and African-American) and skin color (Black).  The hostile work environment included, without limitation, overtly racist comments, the systematic segregation of minority employees into lower-paying positions, the continuing failure to promote Lopez, Gold and other similarly situated minority employees and severe scrutiny. Defendants also subjected Lopez to a hostile work environment, including but

not limited to, retaliatory harassment and retaliatory acts, in response to his opposition to their discriminatory practices and his engaging in protected activity.

124. Defendants also discriminated against Lopez, Gold and other similarly situated minority employees, on the basis of their race and skin color in, among other things, hiring, promotions, assignments and pay.

125. The racial and skin-color discrimination and the hostile work environment suffered by Plaintiffs, and other similarly situated employees, was part of a pattern and practice of racial and skin-color discrimination and harassment created and fostered by Defendants.

126. Defendants Mary Jane Wells and Jaime Hershkowitz aided, abetted, incited, compelled and/or coerced unlawful practices, including the racial and skin-color discrimination and the hostile work environment against Lopez, Gold, and other similarly situated minority employees, and/or attempted to do so.

127. Defendants participated in, approved of, condoned and ratified the discrimination, harassment and the hostile work environment perpetrated against Plaintiffs, as well as other similarly situated minority employees, on the basis of their race and skin color.

128. The racial and skin-color discrimination and the hostile work environment that Defendants perpetrated against Plaintiffs, as well as other similarly situated minority employees, was, and is, continuing and intentional in nature.

129. As a result, Lopez and Gold have suffered loss of earnings, plus interest.

130.   Lopez and Gold are also entitled to compensatory damages for, inter alia, physical personal injury, physical pain and suffering, emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses in the maximum amount permitted by the law.

131.   Because Defendants acted with malice or reckless indifference to Plaintiffs, and other similarly situated minority employees' rights, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, but not less than the maximum amount permitted by law.

### Fourth Cause of Action:

### Racial and Skin-Color Discrimination and Harassment in Violation of The New York State Human Rights Law, Executive Law, Section 296(1)(a) et seq; Aiding, Abetting and Inciting

132.   Plaintiffs allege re-allege and incorporate by reference paragraphs 1 through 131 as if fully set herein.

133.   As set forth more fully above, Defendants subjected Lopez, Gold and other similarly situated minority employees, to a hostile work environment based on Plaintiffs' race (African-American/Hispanic and African-American) and skin color (Black).  The hostile work environment included, without limitation, overtly racist comments, the systematic segregation of minority employees into lower-paying positions, the continuing failure to promote Lopez, Gold and other similarly situated minority employees and severe scrutiny. Defendants also subjected Lopez to a hostile work environment, including but not limited to, retaliatory harassment and retaliatory acts, in response to his

opposition to their discriminatory practices and his engaging in protected activity.

134. Defendants also discriminated against Lopez, Gold and other similarly situated minority employees, on the basis of their race and skin color in, among other things, hiring, promotions, assignments and pay.

135. The racial and skin-color discrimination and the hostile work environment suffered by Plaintiffs, and other similarly situated employees, was part of a pattern and practice of racial and skin-color discrimination and harassment created and fostered by Defendants.

136. Defendants Mary Jane Wells and Jaime Hershkowitz aided, abetted, incited, compelled and/or coerced unlawful practices, including the racial and skin-color discrimination and the hostile work environment against Lopez, Gold, and other similarly situated minority employees, and/or attempted to do so.

137. Defendants participated in, approved of, condoned and ratified the discrimination, harassment and the hostile work environment perpetrated against Plaintiffs, as well as other similarly situated minority employees, on the basis of their race and skin color.

138. The racial and skin-color discrimination and the hostile work environment that Defendants perpetrated against Plaintiffs, as well as other similarly situated minority employees, was, and is, continuing and intentional in nature.

139. As a result, Lopez and Gold have suffered loss of earnings, plus interest.

140. Lopez and Gold are also entitled to compensatory damages for, inter alia, physical personal injury, physical pain and suffering, emotional distress,

suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses in the maximum amount permitted by the law.

**Fifth Cause of Action:**

**Retaliation in Violation of The New York State Human Rights Law Executive Law, Section 296(7)**

141.   Plaintiffs allege, re-allege and incorporate by reference paragraphs 1 through 140 as if fully set forth herein.

142.   As set forth more fully above, Defendants retaliated against Lopez and Gold for their protected complaints of discrimination and harassment, by among other things, harassing them, subjecting them to a hostile work environment, subjecting them to severe scrutiny, denying them promotions, denying them opportunities for advancement, and denying them requested assignments to better paying jobs and positions.

143.   The retaliation suffered by Lopez and Gold was a part of a pattern and practice of retaliation created and fostered by Defendants in response to complaints of discrimination and harassment made by Lopez, Gold and other employees.

144.   Defendants Mary Jane Wells and Jaime Hershkowitz aided, abetted, incited, compelled and/or coerced unlawful practices, including unlawful retaliation, against Lopez, Gold and other workers who complained of discrimination and other unlawful practices.

145.   Defendants participated in, approved of, condoned and ratified the retaliation perpetrated against Plaintiffs, as well as other similarly-situated employees.

146.   The retaliation that Defendants perpetrated against Plaintiffs, as well as other similarly situated employees, was, and is, continuing and intentional in nature.

147.   As a result, Lopez and Gold have suffered loss of earnings, plus interest.

148.   Lopez and Gold are also entitled to compensatory damages for, inter alia, physical personal injury, physical pain and suffering, emotional distress, suffering, mental anguish, and other non-pecuniary losses, in the maximum amount permitted by law.

### Sixth Cause of Action:

#### Racial and Skin-Color Discrimination and Harassment In Violation of Section 8-107 of Title 8 of The New York City Charter and Administrative Code; Aiding, Abetting and Inciting

149.   Plaintiffs allege, re-allege and incorporate by reference paragraphs 1 through 148 as if fully set herein.

150.   As set forth more fully above, Defendants subjected Lopez, Gold and other similarly situated minority employees, to a hostile work environment based on Plaintiffs' race (African-American/Hispanic and African-American) and skin color (Black).  The hostile work environment included, without limitation, overtly racist comments, the systematic segregation of minority employees into lower-paying positions, the continuing failure to promote Lopez, Gold and other similarly situated minority employees and severe scrutiny. Defendants also subjected Lopez to a hostile work environment, including but not limited to, retaliatory harassment and retaliatory acts, in response to his opposition to their discriminatory practices and his engaging in protected activity.

33

151.   Defendants also discriminated against Lopez, Gold and other similarly situated minority employees, on the basis of their race and skin color in, among other things, hiring, promotions, assignments and pay.

152.   The racial and skin-color discrimination and the hostile work environment suffered by Plaintiffs, and other similarly situated employees, was part of a pattern and practice of racial and skin-color discrimination and harassment created and fostered by Defendants.

153.   Defendants Mary Jane Wells and Jaime Hershkowitz aided, abetted, incited, compelled and/or coerced unlawful practices, including the racial and skin-color discrimination and the hostile work environment against Lopez, Gold, and other similarly situated minority employees, and/or attempted to do so.

154.   Defendants participated in, approved of, condoned and ratified the discrimination, harassment and the hostile work environment perpetrated against Plaintiffs, as well as other similarly situated minority employees, on the basis of their race and skin color.

155.   The racial and skin-color discrimination and the hostile work environment that Defendants perpetrated against Plaintiffs, as well as other similarly situated minority employees, was, and is, continuing and intentional in nature.

156.   As a result, Lopez and Gold have suffered loss of earnings, plus interest.

157.   Lopez and Gold are also entitled to compensatory damages for, inter alia, physical personal injury, physical pain and suffering, emotional distress, suffering, mental anguish, and other non-pecuniary losses, in the maximum amount permitted by law.

158. Because Defendants acted with malice or reckless indifference to Plaintiffs, and other similarly situated minority employees' rights, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, but not less than the maximum amount permitted by law.

### Seventh Cause of Action:

### Retaliation In Violation of Section 8-107 of Title 8 of The New York City Charter and Administrative Code; Aiding, Abetting and Inciting

159. Plaintiff alleges, re-alleges and incorporates by reference paragraphs 1 through 158 as if fully set forth herein.

160. As set forth more fully above, Defendants retaliated against Lopez and Gold for their protected complaints of discrimination and harassment, by among other things, harassing them, subjecting them to a hostile work environment, subjecting them to severe scrutiny, denying them promotions, denying them opportunities for advancement, and denying them requested assignments to better paying jobs and positions.

161. The retaliation suffered by Lopez and Gold was a part of a pattern and practice of retaliation created and fostered by Defendants in response to complaints of discrimination and harassment made by Lopez, Gold and other employees.

162. Defendants Mary Jane Wells and Jaime Hershkowitz aided, abetted, incited, compelled and/or coerced unlawful practices, including unlawful retaliation, against Lopez, Gold and other workers who complained of discrimination and other unlawful practices.

163.    Defendants participated in, approved of, condoned and ratified the retaliation perpetrated against Plaintiffs, as well as other similarly-situated employees.

164.    The retaliation that Defendants perpetrated against Plaintiffs, as well as other similarly situated employees, was, and is, continuing and intentional in nature.

165.    As a result, Lopez and Gold have suffered loss of earnings, plus interest.

166.    Lopez and Gold are also entitled to compensatory damages for, inter alia, physical personal injury, physical pain and suffering, emotional distress, suffering, mental anguish, and other non-pecuniary losses, in the maximum amount permitted by law.

167.    Because Defendants acted with malice or reckless indifference to Plaintiffs, and other similarly situated minority employees' rights, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, but not less than the maximum amount permitted by law.

**WHEREFORE**, Plaintiffs Lopez and Gold respectfully request that this Court:

A.    Declare and adjudge that Plaintiffs Lopez and Gold were unlawfully subjected to a hostile work environment, retaliated against and denied promotions, positions, opportunities for advancement and compensation increases, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., 42 U.S.C. 1981, The New York State Human Rights Law, Executive Law, Section 296(1)(a) et seq and Section 8-107 of Title 8 of the New York City Charter and Administrative Code;

B.    Enjoin Defendants from continuing to engage in a pattern and practice of discrimination and segregation in their employment practices;

C. Award Plaintiffs Lopez and Gold back pay and front pay, with attendant benefits for the damages they have suffered by way of Defendants' failure to promote, compensate and/or hire them;

D. Award Plaintiffs Lopez and Gold compensatory damages;

E. Award Plaintiffs Lopez and Gold punitive damages;

F. Award attorneys' fees and costs;

G. Provide such other and further relief as is just and proper.


Dated: New York, New York    Respectfully submitted,
   November 23, 2005    ARENSON, DITTMAR & KARBAN


            /s/_____
            By: Steven Arenson SA-9118
            Attorneys for Plaintiffs
            Valentino Lopez and Robert Gold
            295 Madison Avenue, Suite 700
            New York, New York 10017
            (212) 490-3600